UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
TECHNOLOGY IN PARTNERSHIP, INC.,

                          Plaintiff,

                                                        10 CV 8076 (RPP)

          -against-

                                                        **OPINION & ORDER**

EDWARD M. RUDIN, ALYSE RUDIN, GLORIA
RUDIN, ALYFUNKIDS INC. d/b/a MY GYM
CHILDREN'S FITNESS, MY GYM WESTFIELD
INC. d/b/a MY GYM CHILDREN'S FITNESS
CENTER, MY GYM GLEN ROCK, INC., RUDIN
APPRAISALS, LLC, ALAN ZVERIN, ZVERIN &
FISCHER, LLP and EISMAN, ZUCKER, KLEIN
& RUTTENBERG, LLP,

                          Defendants.
------------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

I.      **Procedural History**

        On October 22, 2010, Plaintiff Technology in Partnership, Inc. ("TIP"), a corporation

organized to provide computer consulting services, including installation and support to

businesses, commenced this action by filing a complaint (the "Complaint") alleging that

Defendant Edward M. Rudin ("Rudin") operated for over 12 years an enterprise engaged in the

common goal of diverting and stealing funds from TIP in violation of the Civil Racketeering

Involved Corruption Act ("RICO"), 18 U.S.C. § 1962, and various state laws.  (Compl. ¶ 5.)  The

Complaint states that TIP was jointly created and capitalized by Rudin and Robert Baker

("Baker").  (Id. ¶¶ 28-29.)

        On January 26, 2011, Defendants Rudin, Alyse Rudin, Gloria Rudin, Alyfunkids Inc.

d/b/a My Gym Children's Fitness, My Gym Westfield Inc. d/b/a My Gym Children's Fitness

Center, My Gym Glen Rock, Inc., and Rudin Appraisals, LLC (collectively, the "Rudin

Defendants"), who had not yet filed an Answer to the Complaint, filed a motion to dismiss the

Complaint based entirely on statute of limitations grounds.  Defendants Alan Zverin, Zverin &

Fischer, LLP, and Eisman, Zucker Klein and Rutenberg, LLP (collectively, the "Accountant

Defendants"), who had also not yet filed an Answer, moved separately to dismiss the Complaint

for failure to state a claim upon which relief may be granted, pursuant to Fed. R. Civ. P. 12(b)(6).

On October 4, 2011, the Court granted the Accountant Defendants' motion in its entirety but

denied the Rudin Defendants' motion in its entirety on the grounds that the Rudin Defendants

had not established that Mr. Baker, who served as president and majority stockholder of TIP,

knew or should have known of Defendants' alleged fraudulent actions prior to the date he

asserted control of TIP in May 2010.  Tech. in P'ship, Inc. v. Rudin, No. 10 CV 8076, 2011 WL

4575237 (S.D.N.Y. Oct. 4, 2011).

     The Court's October 4, 2011 Order denying the Rudin Defendants' motion also Ordered

the deposition of Robert Baker on the specific issue of "what date he, as director, President, and

majority shareholder of TIP knew or should have known of the actions complained of in the civil

RICO causes of action." Id.  Baker was subsequently deposed on November 3, 2011.  On

December 16, 2011, the Court endorsed Defendants' letter request for a discovery Order

compelling production of:

> 1.    All documents that were in the files Mr. Baker identified at
> his deposition that were in his home and pertained to the plaintiff,
> including without limitation, any financial records, tax forms,
> employment agreements, and limited liability company
> agreements, FEMA application submitted by Mr. Baker on behalf
> of the plaintiff, and any other agreements or other documents
> pertaining to the plaintiff; and
>
> 2.    All other documents in Mr. Baker's possession or control at
> any time prior to May 2010 pertaining to the plaintiff, including

any such documents in the possession of his accountant or lawyer
identified in this deposition.

(See Order dated Dec. 16, 2011, Ex. B, ECF No. 43.)

On January 13, 2012, Defendants filed an Answer to the Complaint.  On February 8,
2012, approximately 16 months after this action was commenced, Defendants filed a motion to
stay the proceedings and compel arbitration.  On March 19, 2012, Plaintiff filed opposition
papers and cross-moved for Rule 37 sanctions against Defendants, alleging violations of the
Court's discovery Orders.  On April 23, 2012, Defendants filed a memorandum of law in reply to
its motion to compel arbitration and in opposition to Plaintiff's cross-motion for sanctions.  On
May 7, 2012, Plaintiff filed its reply papers on the motion for sanctions.  On June 13, 2012, the
Court held oral argument on both motions.

For the following reasons, Defendants' motion to compel arbitration is denied.  The
Court assumes familiarity with the underlying facts of this case and will recite only the facts
pertinent to the motions pending before the Court.

## II.    Motion to Compel Arbitration

### A.    Relevant Facts

Plaintiff TIP is a closely-held corporation that was formed to provide computer
consulting services. (Defs.' Mem. of Law in Supp. of Mot. to Compel Arbitration ("Defs.'
Mem.") at 2; Compl. ¶ 28.)  TIP was formed on October 3, 1997 as a New Jersey corporation
with Robert Baker and Edward Rudin as its sole directors.  Upon the formation of TIP, a
Shareholder Agreement was entered into between TIP, Baker, and Rudin.  (Defs.' Mem. at 2.)
Additionally, Rudin entered into an Employment Agreement with TIP.  (Id. at 2-3.)  Both TIP's
Shareholder Agreement and Rudin's Employment Agreement contain the same arbitration
clause:

3

> Any controversy or claim arising out of or relating to this Agreement or the breach thereof, shall be settled by arbitration in the County of Mercer, State of New Jersey in accordance with the rules then applicable to the American Arbitration Association, and judgment upon any award rendered may be entered in any court of competent jurisdiction.

(Id. at 3.)

The Shareholder Agreement that was produced to the Court by the Rudin Defendants is not signed by either Baker or Rudin.  (Smith Decl., Exs. 3-4.)  Rudin's Employment Agreement is signed by Rudin, and Baker's initials appear on only two pages of the document, reflecting assent to certain handwritten modifications.  (Smith Decl., Ex. 5.)  Although neither agreement was fully executed, both were treated by Baker and Rudin as correctly reflecting their business arrangements.  (Defs.' Mem. at 3–4.)  Both parties agree that Rudin was in possession of both the Shareholder Agreement and the Employment Agreement before this action was commenced.  (Pl.'s Mem. of Law: (1) in Opp'n to the Rudin Defs.' Mot. to Compel Arbitration; and (2) in Supp. of Pl.'s Mot. for Sanctions Pursuant to Fed. R. Civ. P. 37 ("Pl.'s Mem.") at 9; Tr. of Jun. 13, 2012 Oral Arg. ("Tr. 6/13/12") at 13:3-10 ("It was used at a deposition of Mr. Baker that took place before the plaintiff produced any discovery").)

    B.    <u>Legal Standard</u>

The Federal Arbitration Act (the "Act") requires courts to stay any action where a written arbitration agreement provides for arbitration of the dispute.  9 U.S.C. § 2.  Section 2 of the Act provides:

> [A] written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such

4

> grounds as exist at law or in equity for the revocation of any contract.

Id. The Act is an expression of a strong federal policy favoring arbitration as an alternative means of dispute resolution. JLM Indus., Inc. v. Stolt-Nielsen SA, 387 F.3d 163, 171 (2d Cir. 2004) (quoting Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp., 246 F.3d 219, 226 (2d Cir. 2001)). Indeed, waiver of the right to arbitration is "not to be lightly inferred," Cotton v. Slone, 4 F.3d 176, 179 (2d Cir. 1993) (quoting Carcich v. Rederi A/B Nordie, 389 F.2d 692, 696 (2d Cir. 1968), and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." JLM Indus., 387 F.3d at 171 (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24–25 (1983)).

    C.    Discussion

Defendants argue that TIP is obligated to arbitrate the claims in the Complaint pursuant to the broad arbitration clause contained within both the TIP Shareholder Agreement and Rudin's Employment Agreement, which mandates that "[a]ny controversy or claim arising out of or relating to this Agreement or the breach thereof, shall be settled by arbitration." (Defs.' Mem. at 1–2.) Defendants further contend that the claims against the Rudin Defendants other than Edward Rudin are so intertwined with the claims against Rudin that those claims should also be subject to arbitration. (Id. at 15.) Plaintiff, however, argues that Defendants waived their right to arbitration by waiting for over fifteen months after the commencement of this litigation to raise the arbitration issue, thereby causing significant prejudice to Plaintiff. (Pl.'s Mem. at 1.)

        1.    Right to Arbitration

As an initial matter, Plaintiff does not contest the validity or scope of the arbitration clause, nor does it contest that the claims asserted in the Complaint, including the RICO claims, are eligible for arbitration as they apply to Edward Rudin. See, e.g., Shearson/Am. Express, Inc.

v. McMahon, 482 U.S. 220, 238 (1987) ("[T]here is nothing in the text of the RICO statute that even arguably evinces congressional intent to exclude civil RICO claims from the dictates of the Arbitration Act."); JLM Indus., 387 F.3d at 174 (discussing the arbitrability of RICO claims). Thus, the resolution of Defendants' motion to compel arbitration will turn on whether or not the affirmative defense of arbitration has been waived.

            2.    *Waiver*

                a.   Legal Standard for Waiver

The right to arbitrate is "an affirmative defense that is waived where the party seeking to raise the defense engages in protracted litigation that results in prejudice to the opposing party." Brookridge Funding Corp. v. Nw. Human Res., Inc., 170 F. App'x 170, 171 (2d Cir. 2006) (quoting Cotton, 4 F.3d at 179 (internal quotation marks omitted)). "Waiver of arbitration is not to be lightly inferred." La. Stadium & Exposition Dist. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 626 F.3d 156, 161 (2d Cir. 2010) (quoting PPG Indus., Inc. v. Webster Auto Parts, Inc., 128 F.2d 103, 107 (2d Cir. 1997)). In determining whether a party has waived its right to arbitration by expressing its intent to litigate the dispute in question, the Court considers three factors: "(1) the time elapsed from when litigation was commenced until the request for arbitration; (2) the amount of litigation to date, including motion practice and discovery; and (3) proof of prejudice." La. Stadium & Exposition Dist., 626 F.3d at 159.

Of these three factors, prejudice is paramount and is required for a finding of waiver due to participation in litigation. Id. Prejudice "can be substantive, such as when a party loses a motion on the merits and then attempts, in effect, to relitigate the issue by invoking arbitration, or it can be found when a party too long postpones his invocation of his contractual right to arbitration, and thereby causes his adversary to incur unnecessary delay or expense." Kramer v.

Hammond, 943 F.2d 176, 179 (2d Cir. 1991).  "Such prejudice has been found where 'a party

seeking to compel arbitration engages in discovery procedures not available in arbitration, makes

motions going to the merits of an adversary's claims, or delays invoking arbitration rights while

the adversary incurs unnecessary delay or expense.'"  Brookridge Funding Corp., 170 F. App'x

at 171 (quoting Cotton, 4 F.3d at 179).  There is no "rigid formula" or "bright-line rule" for

identifying when a party has waived its right to arbitration; rather, the above factors must be

applied to the specific context of each particular case.  La. Stadium & Exposition Dist., 626 F.3d

at 159.

> b.  TIP Was Prejudiced by Defendants' Litigation and Delay

Defendants delayed for over fifteen months from the date the Complaint was filed before

filing the instant motion to compel arbitration.  At the outset of this litigation, Defendants filed a

motion to dismiss on statute of limitations grounds, without raising the issue that arbitration

might be available in this case.  Instead, Defendants first raised the issue of arbitration in their

Answer, which was filed two months after Baker's deposition and some fifteen months after the

commencement of this action.  Defendants justify this delay by arguing that they could not

establish a clear right to arbitration until after Baker's deposition, at which Baker acknowledged

that Rudin's Employment Agreement correctly reflected their business arrangements.  (Defs.'

Reply Mem. of Law in Supp. of Mot. to Compel Arbitration and in Opp'n to the Cross-Mot.

("Defs.' Reply") at 4, 6 ("It was only during the course of the Baker deposition that the Rudin

Defendants were able to establish that the document was in fact an authentic agreement.").)  This

argument, however, is without merit.

Edward Rudin, as a shareholder, vice-president, and secretary of TIP, had access to and

knowledge of TIP's business documents and was on notice of the arbitration clause before

Baker's deposition.  Indeed, because Baker's deposition predated Defendants' discovery requests, it is clear that Defendants were in possession of both the Shareholder Agreement and Rudin's Employment Agreement containing the arbitration clause prior to November 3, 2011 at the very least.  However, it was not until three months after Baker's deposition, two months after the Court's December 16, 2011 Order granting Defendants' request for document production, and two discovery conferences before the Court that Defendants filed their motion to compel.  As Plaintiff correctly notes, Defendants could have moved to compel arbitration prior to forcing TIP to defend two motions to dismiss, or, at the very least, notified the court of the existence of the arbitration clause prior to their request for further discovery.  See, e.g., Leadertex, Inc. v. Morganton Dyeing & Finishing Corp., 67 F.3d 20, 26 (2d Cir. 1995) (raising affirmative defenses without asserting right to compel arbitration is a significant factor in waiver); Forrest v. Unifund Fin. Grp., Inc., No. 04-CV-5151 (LTS), 2007 WL 766297, at *6 (S.D.N.Y. Mar. 13, 2007) (denying motion to compel arbitration made eighteen months after the action was commenced where "[d]efendants had the opportunity to raise the arbitration issue in response to the initial complaint but elected to proceed with litigation, in an attempt to have the case dismissed on the merits in court").

c.  Discovery Prejudice

Pursuing discovery not otherwise always available in arbitration while on notice of the availability of arbitration is proof of prejudice.  See Zwitserse Maatschappij van Levensverzekering En Lijfrente v. ABN Int'l Capital Mkts. Corp., 996 F.2d 1478, 1480 (2d Cir. 1993) (per curiam) (waiver found where party litigated for over a year and engaged in discovery not available in arbitration).  Here, Defendants have availed themselves of significant discovery under the Federal Rules of Civil Procedure that may not be allowed in arbitration.  See Martin v.

SCI Mgmt. L.P., 296 F. Supp. 2d 462, 468 (S.D.N.Y. 2003); Ciago v. Ameriquest Mortg. Co., 295 F. Supp. 2d 324, 333 (S.D.N.Y. 2003).

Following the November 3, 2011 deposition of Baker, on December 16, 2011 the Court Ordered TIP to produce a significant number of documents, pursuant to Defendants' discovery requests.  (See Order dated Dec. 16, 2011, Ex. B, ECF No. 43.)  Plaintiff has produced approximately 4,000 pages of documents and sixteen gigabytes of electronically stored information as a result of the Court's Order.  (Pl.'s Mem. at 4-5.)  Furthermore, as discussed infra, Plaintiff states that this case may involve substantial spoliation of evidence issues, which, Plaintiff argues, may require significant non-party discovery – discovery that an arbitrator may or may not choose to provide to Plaintiff.  See Martin, 296 F. Supp. 2d at 468; Ciago, 295 F. Supp. 2d at 333.  TIP argues that without access to this non-party discovery, it will be unable to present its claims properly.

Specifically, TIP maintains that a significant amount of documents, including the financial records of TIP from 1997 to 2004, are still outstanding, despite the fact that the Court ordered them produced on January 6, 2012.  (See Endorsed Letter dated Jan. 10, 2012, ECF No. 46; Tr. 6/13/12 at 17.)  Thus, TIP argues, if these documents are no longer available, significant nonparty depositions will have to be taken from, inter alia, the former Accountant Defendants and from the corporate entity of the My Gym franchises, to which TIP alleges the stolen funds were funneled.  (Tr. 6/13/12 at 17.)

Defendants argue that the Second Circuit in Guyden v. Aetna, Inc., 544 F.3d 376 (2d Cir. 2008), was "not willing to entertain the possibility that an arbitrator is going to act in a completely arbitrary and unreasonable manner in denying a party reasonable discovery."  (Tr. 6/13/12 at 26:1-6.)  However, Defendants' citation to Guyden is inapposite. Unlike the instant

9

arbitration agreement, the arbitration agreement at issue in <u>Guyden</u> gave the arbitrator the power to order additional discovery upon a showing by the plaintiff that such discovery was necessary to enable her to present her claim.  Plaintiff Guyden had both a statutory <u>and</u> a contractual basis for further discovery should it have proven necessary to her claim.  <u>Guyden</u>, 544 F.3d at 386–87. By contrast, here, if the case were to go to arbitration, TIP would find itself at the mercy of the arbitrator's discretion.[1]

> *3.*     *Conclusion*

Defendants' have conducted significant litigation before this court.  Defendants have filed a motion to dismiss, participated in court-ordered conferences involving hotly contested discovery issues, engaged in significant pretrial discovery that may be unavailable in an arbitral forum, and forced TIP to expend considerable resources over an almost sixteen-month period, all before ever raising the arbitration issue.  Accordingly, Defendants' Motion to Compel Arbitration is denied.  <u>See</u> <u>Cotton</u>, 4 F.3d at 179–80 (finding that active litigation of the dispute in federal court, undertaking of discovery, filing of substantive motions, and the resultant expense and delay was prejudice sufficient to compel a finding of waiver).

## III.     **Motion for Sanctions**

### A.     <u>Relevant Facts</u>

---

[1] The arbitration clause contained within the Shareholder Agreement and Rudin's Employment Agreement expressly incorporated the Commercial Rules of the American Arbitration Association, which include the following:

> L-4. Management of Proceedings . . . (c) The parties may conduct such discovery as may be agreed to by all the parties provided, however, that the arbitrator(s) may place such limitations on the conduct of such discovery as the arbitrator(s) shall deem appropriate . . . (d) At the discretion of the arbitrator(s), upon good cause shown and consistent with the expedited nature of arbitration, the arbitrator(s) <u>may</u> order depositions of, or the propounding of interrogatories to, such persons who may possess information determined by the arbitrator(s) to be necessary to determination of the matter."  (emphasis added).

It is undisputed that Rudin and Baker formed TIP in 1997.  At that time, the company operated out of rented office space, (see Rudin Decl. ¶ 6), and stored all of its data on a single server (the "First TIP Server"), which functioned as the "'brains' of the company."  (Watkis Decl. ¶ 5.)  Since its inception, TIP used the software program Quick Books to maintain its accounting records.  (Transcript of Feb. 16, 2012 Conference ("Tr. 2/16/12") at 7:20–24.)

From 2006 onward, TIP employed Roy W. Watkis II ("Watkis") as an information technology ("IT") consultant.  (Id. ¶ 3.)  Watkis was responsible for, among other things, "assist[ing] TIP with its own IT needs."  (Id.)  In 2007 or 2008, TIP encountered a problem with the First TIP Server.  (Id. ¶ 4.)  As a result, Watkis "built a new server for TIP and migrated all of the dat[a] off of the old server to a new server"  (Id.)  According to Watkis, this new server (the "Second TIP Server") was "a large computer measuring approximately 2 ½ feet tall by 19 inches wide."  (Watkis Reply Decl. ¶ 8.)  Once the Second TIP Server was operational, "Rudin moved the new server to his home in North Brunswick, New Jersey, and he operated TIP from his residence thereafter."  (Watkis Decl. ¶ 4; see also Rudin Decl. ¶ 6.)

While Watkis built the Second TIP Server to hold TIP's data, Watkis also arranged for his company, Notlin Technologies ("Notlin"), to "provide[] remote hosting of TIP's e-mail accounts on Notlin's server (the "E-mail Server").  This e-mail hosting was separate and apart from the [Second TIP] Server, which contained all of TIP's other files and information." (Watkis Reply Decl. ¶ 3.)  The parties agree that from this point in 2007 or 2008 onward, TIP's financial data was stored on the Second TIP Server, which was within Rudin's personal control and located at his home, whereas all of TIP's e-mails – and any documents attached to them, including financial documents that might also be stored on the Second TIP Server – were stored separately on the E-mail Server, which was under Notlin's control.

The parties disagree substantially about what happened to the Second TIP Server from this point forward and who had access to which files and at what time.  According to Rudin, in early 2009 the Second TIP Server "would not turn on," so he enlisted the help of a computer technician, Scott Hlavacek ("Hlavacek"), to fix the machine.  (Rudin Reply Decl. ¶ 2; Hlavacek Decl. ¶¶ 3-4; Tr. 6/13/12 at 46:4-10.)  Hlavacek had been employed by TIP from 1999-2002 on a full-time basis as a computer technician.  (Hlavacek Decl. ¶ 2.)  In that capacity, he "was responsible for managing and maintaining all of TIP's corporate computer equipment, including desktops and servers.  Thereafter [he] worked from about 2003-2004 as a computer technician for TIP on a consulting basis."  (Id. ¶ 3.)  "As a favor to Mr. Rudin," whom Hlavacek "had known for years," Hlavacek "attempted to repair" the Second TIP Server.  (Id.)  "In order to save the data from the server's hard drive, [Hlavacek] removed the server's hard drive and re-installed it into" a different machine, "a desk-top computer, which then was set up and thereafter used as" the new TIP Server (the "Third TIP Server").  (Id. ¶ 4; Tr. 6/13/12 at 44:11-8, 71:11-23.)  Rudin contends that this desktop computer "is the only TIP [S]erver that existed in May 2010."  (Rudin Reply Decl. ¶ 3.)

Rudin claims that in "May of 2010, Mr. Baker froze me out of the business without notice and without my consent or knowledge took over the operations of the business."  (Rudin Decl. ¶ 5.)  "In an effort to protect [himself] from Mr. Baker . . . [Rudin] cut off access to the [Third] TIP [S]erver" located in his home.  (Id. ¶ 6; see also Baker Decl. ¶ 3.)  However, in July of 2010, in what Rudin asserts was "a good faith effort to resolve this issue," he "permitted Mr. Baker to obtain remote access to the [Third] TIP [S]erver after making a copy of the server's contents."  (Id. ¶¶ 7, 8.)  Rudin asserts that "after opening up access to the server, Mr. Baker's computer assistants changed the password or access codes for the server," and that for "about 10

12

months, Mr. Baker had remote access to the [Third] TIP [S]erver." (Id. ¶ 7.)  When it became

clear to Rudin that the parties were "not going to be able to resolve the matter, [he] unplugged

the [Third TIP S]erver and stored it at [his] house."  (Id.)

Rudin states that "in July of 2010, after I gave Mr. Baker remote access to the server, his

counsel wrote my attorney an e-mail stating 'my client and an independent accounting firm have

reviewed the 'quick books,' payroll and other records of [TIP] that were maintained by Eddie

Rudin.'" (Id. ¶ 8.)  According to Rudin, that same e-mail claimed that Rudin had improperly

paid his mother $130 per month out of TIP's funds for many years and "attached to the e-mail a

print-out from the TIP Quick Books records" as proof.  (Id.)  Subsequently, Plaintiff filed this

action.

Having denied Defendant Rudin's motion to dismiss and Ordered Baker to be deposed on

the issue of the date he discovered the fraud, see Tech. P'ship, Inc., 2011 WL 4575237, the Court

held a conference with the parties on January 6, 2012.  Thereafter, the Court Ordered:

> 1. Defendants to file an Answer to TIP's Complaint and produce
>    all relevant documents (including complete financial records)
>    by January 13, 2012;
> 2. All parties to serve Rule 26(a) disclosures by January 20, 2012;
>    and
> 3. Defendants to produce Edward Rudin for deposition at a date
>    to be agreed upon by counsel on or before February 10, 2012.

(Endorsed Letter dated Jan. 10, 2012, ECF No. 46.)

At the follow-up status conference held on February 16, 2012, plaintiff asserted that

"we've been unable to get the majority of the discovery that we had discussed at the last

conference.  We had discussed the books and records of [TIP] would be turned over. . . ."  (Tr.

2/16/12 at 2:9-12.)  Plaintiff's attorney, Mr. Jarrett Behar, Esq. ("Behar") represented that

"While I have received thousands of pages of documents from the Rudin defendants, it's largely

either redundant of the thousands of pages that we had previously produced on behalf of plaintiff

and, for the most part, does not extend prior to 2005." (Id. at 2:15-19.)  Behar further explained

that

> "I haven't received the Quick Books, I don't have payables
> journals, I don't have receivables journals, balance sheets, profit
> loss statements.  I don't have – I almost don't have anything to
> give to a forensic accountant to even get an analysis performed,
> which will enable me to depose Mr. Rudin as to the extent of the
> scheme
> [. . .]
> I don't have any financial documents from this company since
> 1997 to 2004, nothing.  Everything that was produced . . . none of
> that goes past 2005."

(Id. at 2:19-24, 8:5-17.)

Defendant Rudin's counsel, Mr. Nathaniel Smith, Esq. ("Smith") responded by asserting

that "I have turned over almost everything," (id. at 3:15-16), but that Smith did not have the right

program to open the Quick Books files, which were stored on a hard drive in his office.  (Id. at

4:17-25.)  The parties agreed that defendants would turn over the TIP Server hard drive to

plaintiff with the stipulation that plaintiff would not use any attorney-client privileged material

contained on it.  (Id. at 5:15-25.)  Smith further stated that "I can explain Mr. Behar's

mystification about why there aren't all these documents that he believes should exist . . . in the

regular course, as things became aged, they were dumped long before this lawsuit ever came

about."  (Id. at 8:22-23, 9:9-11.)

The parties disagree about whether or not Smith fulfilled his promise to turn over the TIP

Server hard drive.  On February 23, 2012, the Rudin Defendants provided TIP with a desktop

computer that the Rudin Defendants represented to be the TIP Server.  (Pl.'s Mem. at 6; Rudin

Decl. ¶ 9.)  TIP hired Watkis to review the computer, (Pl.'s Mem. at 6), and he concluded that

Rudin's representation that this is the TIP Server "is simply untrue."  (Watkis Reply Decl. ¶ 6.)

14

Reiterating that he had personal knowledge of the TIP Server because he built the Second TIP

Server in 2007 or 2008, Watkis explained that "[i]n addition to the fact that the computer

provided by Mr. Rudin had no real data prior to 2006, the computer that I was provided looked

nothing like, and indeed was much smaller than, the actual Server."  (Id. ¶ 7; see also id. ¶¶ 8-10;

Pl.'s Mem. at 6; Tr. 6/13/12 at 41:1–9.)

On March 19, 2012, Plaintiff filed the motion for sanctions presently before the Court.

Plaintiff alleges that

> The Rudin Defendants have ignored the Court's . . . orders to
> provide TIP with TIP's books and records dating back to TIP's
> inception in 1997.  While they have produced thousands of largely
> irrelevant documents . . . almost none of those documents are dated
> prior to 2005.  While they were ordered and, indeed consented to,
> producing [sic] TIP's server, they have failed to do so, instead
> producing a desktop computer that contains no file related to TIP
> prior to 2006.  . . . [They] have failed to produce any meaningful
> documents or records from . . . the critical period between 1997
> and 2004.

(Pl.'s Mem. at 1-2, 5.)  Plaintiff points out that at the February 16, 2012 conference, "counsel for

the Rudin Defendants specifically represented to the Court that [TIP's books and records], going

back to TIP's inception, were contained on TIP's [S]erver, which would be promptly produced."

(Id. at 15.)  Instead, Plaintiff asserts that "Defendants produced a substitute desktop computer

that had no relevant files older than 2006."  (Id.)  Citing the Rudin Defendants' alleged "repeated

failure to comply with the Court's discovery orders" and "stonewalling" tactics, plaintiff argues

that "sanctions pursuant to Fed. R. Civ. P. 37 . . . should be granted."  (Id. at 3, 5.)

On April 17, 2012, Defendants produced a disk that contained a copy of the QuickBooks

file that Plaintiff requested.  (Tr. 6/13/12 at 62:10–13.)  Rudin also states that he sent his attorney

"a copy of the Quick Books file from my back-up file and I understand that that file [was also]

produced" at that time.  (Rudin Decl. ¶ 10.)

In the Rudin Defendants' opposition papers, dated April 23, 2012, Rudin contends that the desktop computer produced to Plaintiff was in fact the TIP Server, specifically the Third TIP Server.  (Defs.' Reply at 12; see also Rudin Reply Decl. ¶ 3; Hlavacek Decl. ¶ 4.)  He further explains that as part of the discovery process in this case, he brought to his counsel's office all of the TIP records in his possession, which consisted of "15 large boxes of TIP documents as well as the actual [Third] TIP [S]erver that was still stored at [his] house."  (Rudin Decl. ¶ 9.)  According to Rudin, "[a]s of that time, the server had all the data required to run the business on a day-to-day basis and I do not have any recollection or knowledge of any gaps or missing TIP data."  (Rudin Reply Decl. ¶ 4.)

Rudin also argues that plaintiff's motion for sanctions was made in bad faith because "the evidence proves that TIP already had access to the server and that [it] has had in its possession for years the 'Quick Book' records that it now pretends that it needs to be produced by the Rudin Defendants."  (Defs.' Reply Mem. at 12) (emphasis in original.)  As discussed supra, Rudin maintains that he provided Baker with remote access to the Third TIP Server for 10 months after the initiation of this action, and that in that time period "Baker's computer assistants changed the password or access codes for the server."  (Rudin Decl. ¶ 7; see also discussion supra at p. 13.)  Rudin asserts that "I have not had access to the TIP [S]erver since 2010, when I turned over access to it remotely to Mr. Baker and the password was changed" and that "if the records [Plaintiff] seek[s] are no longer on the server, then it is because Mr. Baker removed the data from the server when he had access to it in 2010."  (Id.)

In its reply, dated May 7, 2012, Plaintiff contends that the Rudin Defendants' statement that Baker had access to the TIP Server in May 2010 is "completely baseless."  (Reply Mem. of Law in Further Supp. of Pl.'s Mot. for Sanctions Pursuant to Fed. R. Civ. P. 37 ("Pl.'s Reply

Mem.") at 2.)  Indeed, Baker asserts that when he seized control of TIP from Rudin in May 2010, "the only TIP documents that I was able to gain access to were those on TIP's remote e-mail server hosted by Notlin Technologies," not the financial documents stored on the TIP Server. (Baker Decl. ¶ 5.)  Subsequently, he reviewed "limited documentation that was provided by defendant Edward Rudin in an attempt to settle the dispute in June 2010."  (Id.)  In addition, Baker explained that "the limited Quickbooks [and] any other accounting records that I obtained at that time were either attached to e-mails and located on the remote e-mail server, or were directly provided.  I never obtained access to the TIP [S]erver located at defendant Edward Rudin's house."  (Id. ¶ 7.)

Baker further alleges that "after Mr. Baker uncovered his fraudulent scheme in May 2010," (Pl.'s Reply Mem. at 2), "upon information and belief [Rudin] . . . began actively deleting hundreds of files from the TIP [S]erver, including those containing information related to defendant Edward Rudin's operation of and involvement with the fraudulent enterprise, and important information necessary to operate TIP's business."  (Baker Decl. ¶¶ 8-9; see also Compl. ¶ 104.)  Plaintiff asserts that "these seriously [sic] spoliation accusations cannot be properly investigated without production of the actual server."  (Pl.'s Reply Mem. at 2; see also Tr. 6/13/12 at 69:14-70:4.)

Ultimately, Plaintiff contends that sanctions are appropriate because the Rudin Defendants' counsel specifically stated on the record at the February 16, 2012 conference that the TIP Server would be produced and, according to Plaintiff, months later the Rudin Defendants have still not followed through on this promise.  Indeed, Plaintiff asserts that "the Rudin Defendants knew that the computer they were producing was not the TIP [S]erver" when they turned over the desktop computer and its hard drive after the February 16, 2012 conference.

17

(Pl.'s Reply Mem. at 3.)  Therefore, Plaintiff asserts that not only have "the Rudin defendants failed to voluntarily produce the TIP [S]erver and comply with the Court's orders, but [have] also misrepresented to the Court that they would make this production."  (Id. at 4-5.)

At the June 13, 2012 oral argument on the motion to compel arbitration and the cross-motion for sanctions, the Rudin Defendants argued that "the suggestion that Mr. Baker and TIP don't have any information [between 1997 and 2004] is just completely false" because Plaintiff's Complaint "details dates, checks, times, moneys," and "has spreadsheets with dates and everything."  (Tr. 6/13/12 at 34:14, 36:9.)  Indeed, Defendant Rudin's counsel noted that the Complaint specifically details allegedly fraudulent checks issued from 1998 to 2002, which counsel contended undermined Plaintiff's claim that it did not have access to any information from 1997 to 2004.  (Id. at 53:14-24.)  In addition, the Rudin Defendants state that after Baker removed Rudin from TIP, Baker and his associates "took over control of the bank accounts.  They took over control of the customers.  They took over control of the business, of the software, or everything.  And they have access to everything."  (Id. at 35:10-14, 49:14-50:13.)  Finally, the Rudin Defendants assert that Baker admitted on page 133 of his deposition that he accessed Rudin's e-mails "from the TIP Server," and that after taking possession of "a server" in May 2010, Baker said he "had all the information."  (Id. at 35:24-36:6, 54:3-25, 65:10-13.)

TIP's counsel clarified that "Mr. Baker . . . [only] had access to TIP's e-mail server.  The e-mail server and the physical computer server are two different things . . . . That's all the information that we have from the complaint, derived from information we were able to get off the e-mail server in May of 2010.  We've never had access to the physical server . . . ."  (Id. at 39:11-25.)  In response to Defendant Rudin's representation that Mr. Hlavacek had migrated the TIP Server and all of its files from the Second TIP Server that Mr. Watkis built in 2007 or 2008

18

to a Third TIP Server, housed in a desktop computer, TIP's counsel asserted that the computer

represented by defendants as the TIP Server "doesn't have the data it should.  That's the

important point.  And that's never addressed."  (Id. at 40:21-24.)

A week after the oral argument, Rudin explained in a sworn statement attached to a letter

to the Court filed on June 20, 2012 how he addressed the Court's request that he "provide any

information [he] might have as to why the TIP [S]erver's hard drive produced to TIP's counsel

does not contain any data for the period from 1998 through 2005."  (Rudin Reply Decl. ¶ 4.)

Rudin states that on June 19, 2012, he went to his "counsel's office with Mr. Hlavacek for the

purpose of trying to obtain information about the contents of the hard drive."  (Rudin Reply

Decl. ¶ 5; see also Hlavacek Decl. ¶ 5.)  Once there, Hlavacek, according to his own sworn

statement, also attached to the June 20, 2012 letter, "attempted to access the hard drive in a

desktop computer identified . . . by Mr. Rudin as the TIP [S]erver,' however, the "computer

wo[uld] not 'boot up,'" so Hlavacek "removed the hard drive and attempted to access it through

a laptop."  (Hlavacek Decl. ¶ 5.)  Unfortunately, the TIP Server's hard drive "would not open

through the laptop connection."  (Id.)  Hlavacek stated that he "believe[s] that the circuit board

for the hard drive is at fault" and recommended that "the hard drive should be sent to [a] data

recovery company so that the contents can be retrieved."  (Id.)  Fortunately, the Rudin

Defendants note that "Rudin made a copy of the hard drive before Mr. Baker forced him out of

TIP in May 2010.  It is from this copy that [Smith] sent plaintiff's counsel a copy of the Quick

Books file after receiving the cross-motion for sanctions."  (Defs.' Jun. 20, 2012 Let. at 1.)

In response, Plaintiff filed a letter with the Court on June 25, 2012 taking issue with the

Rudin Defendants' suggestion that "the computer they provided was somehow broken while in

TIP's possession. . . ."  (Pl.'s Jun. 25, 2012 Let. at 1.)  Plaintiff points out that the computer was

19

returned to the Rudin Defendants on March 28, 2012, but that the Rudin Defendants did not

identify the computer as inoperable until their June 20, 2012 letter.  (Id.)  Plaintiff contends that

"with the computer ostensibly inoperable, verification" of Rudin's claim that "he has no

knowledge of why" the computer lacks data from prior to 2006 "becomes impossible."  (Id.)

Plaintiff characterizes Rudin's claim as "nothing more than pure sophistry designed to avoid

having to produce any meaningful discovery from the main period in which TIP alleges that the

defendants looted the company."  (Id. at 2.)

      B.     <u>Legal Standard</u>

      Fed. R. Civ. P. 37 provides, in relevant part, that when a party fails to obey an order to

provide or permit discovery, the Court where the action is pending may issue further "just

orders" that may include the following:

> (i)      directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;
> (ii)     prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
> (iii)    striking pleadings in whole or in part;
> (iv)    staying further proceedings until the order is obeyed;
> (v)     dismissing the action or proceeding in whole or in part;
> (vi)    rendering a default judgment against a disobedient party; or
> (vii)   treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Fed. R. Civ. P. 37(b)(2)(A).  Moreover, "[i]nstead of or in addition to the orders above, the court

must order the disobedient party, the attorney advising that party, or both to pay the reasonable

expenses, including attorney's fees, caused by the failure, unless the failure was substantially

justified or other circumstances make an award of expenses unjust."  Fed. R. Civ. P. 37(b)(2)(C).

The Court's discretion in selecting an appropriate sanction should be guided by a number of factors including:

> (1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the prejudice to the other party; (4) the duration of the period of noncompliance; and (5) whether the non-compliant party had been warned of the consequences of non-compliance.

Richardson v. N.Y.C. Health and Hosps. Corp., No. 05-CV-6278 (KMK) (DF), 2007 WL 2597639, at *6 (S.D.N.Y. Aug. 31, 2007) (internal citations omitted).  The court has wide discretion in imposing sanctions under Rule 37.  Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 107 (2d Cir. 2002).  However, sanctions imposed by a district court pursuant to Rule 37(b)(2) must be "just" and "must relate to the particular claim to which the discovery order was addressed."  Daval Steel Prods. v. M/V Fakredine, 951 F.2d 1357, 1366 (2d Cir. 1991).  Courts in this Circuit typically impose Rule 37 sanctions only when there has been a clear failure to produce materials in the offending party's possession or control, see, e.g., Aliki Foods, LLC v. Otter Valley Foods, Inc., 726 F.Supp.2d 159 (D. Conn. 2010), or where the moving party has demonstrated that spoliation of evidence has occurred, see, e.g., Centrifugal Force, Inc. v. Softnet Comm., Inc., 783 F. Supp. 2d 736 (S.D.N.Y. 2011).

Here, Plaintiff, the moving party, has not met its burden to show that the Rudin Defendants have failed to comply with this Court's January 6, 2012 discovery Order to "produce all relevant documents (including complete financial records)" in their possession and control. Although Plaintiff contends that the Rudin Defendants have failed to comply with the Order because the desktop computer produced and represented to be the TIP Server was not the same TIP Server built by Watkis in 2007 or 2008, Hlavacek's and Rudin's sworn statements explain that the machine Watkis built, the Second TIP Server, broke down, requiring Hlavacek to

21

transfer the data to a desktop computer, and that this computer, which was in use as the Third

TIP Server at the time Baker seized control of TIP, has been produced to Plaintiff.  (Rudin Reply

Decl. ¶¶ 3-4; Hlavacek Decl. ¶ 4; see also Defs.' Reply Mem. at 12.)  Although Watkis

concluded that the computer produced is not the Second TIP Server, his determination was based

on the physical differences between the computer produced and the one he built in 2007 or 2008,

as well as the lack of data older than 2006 on the machine.  (Watkis Reply Decl. ¶ 6.)  The

physical differences between the machines are explained by Hlavacek's actions.  While Plaintiff

may wish to further probe this issue at trial, at this point in the proceedings, the Court is satisfied

with the Rudin Defendants' representation that Rudin produced the only TIP Server in his

possession, and thus the Court finds that the Rudin Defendants have complied with the Court's

January 6, 2012 discovery Order in that respect.

   Plaintiff further contends that the Rudin Defendants' discovery production is not

"complete" because the desktop computer produced lacks any records for the period from 1997

to 2004.  However, the Rudin Defendants have represented that they have produced all of the

records within their possession and control.  Indeed, in his sworn statement Rudin declared that

at the time he brought the Third TIP Server to his counsel's office, "the server had all the data

required to run the business on a day-to-day basis and I do not have any recollection or

knowledge of any gaps or missing TIP data."  (Rudin Reply Decl. ¶ 4.)  In addition, although the

computer identified by the Rudin Defendants as the Third TIP Server now appears to be

inoperable, the Rudin Defendants represent that Rudin made a copy of the hard drive before

exiting TIP in May of 2010, and that the Quick Books file from that copy has already been

provided to Plaintiff.  (Defs.' Jun. 20 Let. at 1.)  While Plaintiff may wish to have the hard drive

sent to a data recovery technician, further probe at trial what happened to the allegedly missing

data, or file additional motions on this issue,[2] at this point in the proceedings the Court accepts

the Rudin Defendants' representation that they have produced all of the records within their

possession or control.

Accordingly, for the reasons stated above, the Court declines to impose sanctions

pursuant to Rule 37 at this time.

## IV.   Conclusion

For the reasons set forth above, the Rudin Defendants' motion to compel arbitration (ECF

No. 48) is hereby denied, and Plaintiff's cross-motion for sanctions (ECF No. 55) is also denied.

IT IS SO ORDERED.

Dated: New York, New York
       August __3a__, 2012

Robert P. Patterson, Jr.
U.S.D.J.

---

[2] At this time, Plaintiff has not made a motion for spoliation.  However, Plaintiff has indicated that it intends to do so if the Rudin Defendants maintain, as they have, that the Rudin Defendants possess no additional relevant records because any records from the period from 1997 to 2004 are now gone.  (See Tr. 2/16/12 at 8:24-9:11; Tr. 6/13/12 at 69:23-70:4).

Copies of this order were faxed to:

*Counsel for Plaintiff:*

**Jarrett Michael Behar**
Sinnreich Kosakoff & Messina LLP
267 Carleton Avenue, Suite 301
Central Islip, NY 11722
(631) 650-1200
Fax: (631) 650-1207
Email: jbehar@skmlaw.net


*Counsel for Defendants:*

**Nathaniel B. Smith**
Law Office of Nathaniel B. Smith
111 Broadway - Suite 1305
New York, NY 10006
212 227 7062
Fax: 212 346 4665
Email: natsmith@att.net

**Jennifer Wu**
Landman Corsi Ballaine & Ford PC
120 Broadway, 27th Floor
New York, NY 10271
(212) 393-7932 x238-4800
Fax: (212) 238-4848
Email: jwu@lcbf.com

**Sophia Ree**
Landman Corsi Ballaine & Ford PC
120 Broadway, 27th Floor
New York, NY 10271
212-238-4800
Fax: 212-238-4848
Email: sree@lcbf.com

**John H. Eickemeyer**
Vedder Price P.C. (NY)
1633 Broadway
47th Floor
New York, NY 10019
212 407 7760
Fax: 212 407 7799
Email: jeickemeyer@vedderprice.com